Nathan G. Steele, OSB#004386
Email: ngs@steelefirm.com
Kari E. Hathorn, OSB#081410
Email: kari@steelefirm.com
The Steele Law Firm
125 NW Greeley Ave
Bend, Oregon 97703
Telephone: (541) 647-1812
Facsimile: (541) 647-1814
Of Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JERRY C. STONE, Personal Representative for the ESTATE OF MARIKA JEANNE STONE, an Oregon Resident,<br><br>        Plaintiff,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | Case No.: 6:20-cv-2270<br><br>**CIVIL COMPLAINT**<br><br>**(Civil Action for Medical Malpractice/Wrongful Death)** |

On behalf of the Estate of Marika J. Stone and her family, plaintiff Jerry C. Stone ("Plaintiff Stone") alleges as follows:

**JURISDICTION AND VENUE**

**1.**

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1346(b), 42 U.S.C. § 233(g), 28 U.S.C. § 2675(a); and 28 U.S.C. § 2679. At all material times MosaicMedical ("Mosaic") is an Oregon Corporation offering medical services to the public in Deschutes County, State of Oregon. Mosaic was deemed by the United States Secretary of Health and Human Services, at all relevant times, an employee of the Public Health Services and therefore eligible for Federal Tort Claim Act coverage pursuant to 42 U.S.C. § 233(g). Therefore, at all times material herein, Defendant United States of America ("Defendant") is the proper party defendant and is liable for the acts and omissions of Mosaic and its agents and/or employees under 28 U.S.C. § 2679 and 42 U.S.C. §233(a) and (g).

**2.**

Venue is proper in the United States District Court of Oregon (Eugene Division) under 28 U.S.C. § 1391 (a)-(c) and (e) because a substantial part of the events giving rise to Plaintiff's claim occurred in this judicial district.

## PARTIES

**3.**

Plaintiff Stone is the duly appointed Personal Representative of the Estate of Marika J. Stone ("Dr. Stone"), pursuant to a Limited Judgment entered in Deschutes County Circuit Court, State of Oregon, and Letters Testamentary issued on January 17, 2018. At the time of Dr. Stone's death, she was 38 years old and was survived by two young children, Kiptyn Charles Stone and Kinley Jeanne Stone (collectively referred to hereinafter as "Children"), who are among the beneficiaries of Dr. Stone's Estate. Dr. Stone is also survived by her identical twin sister, Tansy Brown, her father Gregory Middag and stepmother Karen Middag, her mother Cindy Harvey, and countless friends and colleagues.

4.

Dr. Stone was born in Sandpoint, Idaho on May 28, 1979 and moved with her family to Montana and then Alaska, where she graduated co-valedictorian with her twin sister from Ketchikan High School. Throughout her life, Dr. Stone was accomplished in both her personal and professional endeavors. Dr. Stone attended Willamette University where she was a competitive athlete before graduating Summa Cum Laude in 2001. Dr. Stone graduated from the University of Minnesota School of Dentistry in 2006 and then completed the Advanced Education in General Dentistry program at the University of Texas, San Antonio. In 2007, Dr. Stone acquired Mill Point Dental Center, which she developed into a thriving and lucrative dental practice with a focus on "outstanding customer service." She welcomed her two children into the world in March 2010 and June 2012, respectively.

5.

At all times material, Dr. Stone was active in the community, excelled in all of her athletic endeavors, and was part of a loving circle of friends and family.

6.

At all times relevant Shantel Witt ("Witt") was a resident of Deschutes County, State of Oregon.

7.

At all times material, Mosaic conducts continuous and sustained business activity in Deschutes County. At all times relevant, Mosaic engages various doctors, physician assistants, nurses and staff personnel, including, but not limited to, Elizabeth Winters, NP, Tamara Houston, PA-C, and Dr. Joshua Reiher, MD (hereinafter collectively referred to as "Providers"), who were at all times were acting within the course and scope of their employment and/or agency with Mosaic. Between November

2017 and December 2017 Witt obtained medical treatment from the Providers at Mosaic, and thus, all times material, a physician-patient relationship existed between each of the Providers and Witt.

8.

On December 30, 2017 Witt killed Dr. Stone while driving under the influence of a combination of prescription drugs ("fatal crash"), as described in further detail below.

## PERTINENT FACTUAL BACKGROUND

9.

Plaintiff Stone realleges paragraphs 1 through 8 as though set forth fully herein.

10.

At all times material, it was reasonably foreseeable that a patient who has developed a substance use disorder associated with prescribed addictive drugs will overuse their prescription drugs, engage in drug seeking behavior, and illicitly obtain prescription drugs from other sources without a prescription. At all times material, it was reasonably foreseeable that a patient who has developed a substance use disorder associated with overprescribed addictive drugs (which slow the patient's brain activity and interfere with the patient's judgment, thinking and reaction time) will drive while impaired. At all times material, it was reasonably foreseeable that a patient who is impaired or who overdoses on their prescription drugs while driving can lose control of their vehicle and cause injury to other drivers or bicyclists using the road at the same time as the patient.

11.

In or about the mid-2000s, Witt developed acute situational anxiety associated with traveling. Witt's primary care physician Nancy Brennan ("Brennan"), a licensed doctor of osteopathy who practices in Deschutes County, State of Oregon, prescribed

Clonazepam, a benzodiazepine. Clonazepam is a potent psychoactive medication that can cause a patient to rapidly develop a tolerance and dependence. Clonazepam is a central nervous system depressant, which slows a patient's brain activity and interferes with the patient's judgment, thinking and reaction time. It can further impair a patient's ability to drive a vehicle. Patients who struggle with misuse of Clonazepam are more likely to experience more serious side effects. Although Clonazepam can be used for off-label treatment of acute anxiety, long term use of the drug to treat anxiety is contrary to the applicable standard of care for prescribing physicians as Clonazepam has not been shown to be effective in producing long-term improvement and puts the patient at risk for cognitive impairment, dependence, and withdrawal. Between 2008 and 2016 Brennan continuously overprescribed Witt Clonazepam. Although Brennan originally prescribed Witt approximately 30 pills a month, she inexplicably increased her pill count to 60 in approximately May 2010 which continued through approximately October 2013. Consistent with the amount of Clonazepam overprescribed by Brennan and consumed by Witt, Witt demonstrated the development of tolerance and dependency to Clonazepam.

**12.**

In approximately 2012, Witt developed a contracted 5th toe on her left foot. As a result, Witt was referred to Laura A. Schweger PC and treated by Dr. Laura Schweger ("Schweger"), a licensed physician specializing in the practice of podiatry. At this time, Schweger commenced prescribing Witt Hydrocodone-APAP ("Hydrocodone"), an opioid. Hydrocodone is a central nervous system depressant that can lead to addiction and depression of the central nervous system. As with Clonazepam, Hydrocodone slows a patient's brain activity and interferes with the patient's judgment, thinking and reaction time. It can also impair a patient's ability to drive a motor vehicle. Schweger

knew that Brennan was prescribing ongoing Clonazepam for Witt. Schweger further knew that the concomitant use of Hydrocodone with Clonazepam would potentiate the effects of Hydrocodone. Initially, Schweger prescribed Witt 40 Hydrocodone to be used every four to six hours on an as needed basis. Schweger's initial prescription for Hydrocodone was for only one refill. However, Schweger continued to prescribe Hydrocodone as well as other opioids concurrently with the Clonazepam. While obtaining treatment from Schweger, Witt developed evidence of an opioid use disorder from the high volume of opioids being overprescribed by Schweger. Schweger and/or her office became aware that Witt was overusing the opioids and exhibiting drug seeking behavior. Although Schweger confronted Witt about her pattern of prescription drug misuse, she did not reduce Witt's prescription of opioids or develop any other enforced plan to minimize the risk of Witt continuing to misuse. Instead, Schweger continued to prescribe Witt potentially addictive opioids for another approximately eight months. It was during this period that Witt continued to overuse and exhibit a pattern of drug seeking behavior.

13.

Between 2012 and 2016, Brennan continued to be Witt's primary care provider. During this time, Witt was concomitantly overusing clonazepam and opioids. Further, during this time, Witt had developed a dangerous substance use disorder involving clonazepam and opioids and was engaging in drug seeking behavior.

14.

At all times material, Witt had a valid Oregon Driver's License (No. 5778340). On or about July 14, 2014, Witt was charged with Driving Under the Influence of Intoxicants ("DUII") pursuant to ORS 813.010(4). A breathalyzer test revealed that Witt had a blood alcohol content of 0.14%. Witt was subsequently required to enter in a

substance abuse program.

**15.**

By or about August 2016, Witt commenced medical treatment with Kevin Rueter ("Rueter"), a licensed physician working at High Desert Personal Medicine LLC ("High Desert"). Between approximately August 2016 and November 2017, Rueter prescribed Witt a combination of Clonazepam, Carisoprodol, and Hydrocodone on a chronic long-term basis. Carisoprodol is a muscle relaxant that is also a central nervous system depressant. Carisoprodol is generally used for no more than two to three weeks by physicians. The combination of Clonazepam, Carisoprodol, and Hydrocodone is generally referred to as the "Holy Trinity" of drugs. This potentially lethal combination of drugs can be highly addictive, euphoric, and can cause significant cognitive and physical impairment. In approximately September 2016, Witt contacted Brennan seeking a refill of Clonazepam. At or about this time, Brennan determined that Witt was displaying behavior consistent with drug addiction. Concerned, Brennan checked the Oregon Prescription Drug Monitoring Program ("OPDMP") and discovered that Rueter was prescribing a substantial amount of Clonazepam. In fact, based upon OPDMP, Brennan was concerned that Witt was rapidly escalating her use of Clonazepam and/or stockpiling the drug. Brennan further noted that Rueter was concomitantly prescribing Clonazepam and Hydrocodone. Brennan proceeded to contact Rueter to advise him of her concerns over the amount of drugs that he was prescribing and her concerns that Witt was abusing. Rueter did nothing to address Brennan's concerns and instead continued to prescribe Witt the Holy Trinity on a long-term basis that had no legitimate exam-validated medical purpose. As a result of Rueter's continuous prescription of the

highly addictive and dangerous Holy Trinity drug combination, Witt's substance use disorder worsened.

**16.**

In or about November 2017, Witt sought to establish medical care at Mosaic after Rueter suddenly shut down his medical practice. At all times material, Witt sought treatment from Mosaic's Providers on three separate occasions. Although Witt had a history of misusing drugs, engaging in drug seeking behavior, and use of the Holy Trinity (an extremely dangerous and addictive combination of drugs often misused for euphoric highs and recreational purposes), and despite Mosaic checking the OPDMP and acknowledging the compelling dangers associated with Witt's drug combination, Witt was inappropriately provided with an initial full month refill and then a subsequent refill of the Holy Trinity drugs prior to the fatal crash. The initial November 2017 bridge prescription of Holy Trinity lasted one month. However, after a month, Witt's prescription was allowed to run out, which left Witt without any drugs for approximately a week between appointments. Mosaic knew or should have known that abruptly stopping this combination of drugs could lead Witt to a dangerous withdrawal state or drive her to seek out similar drugs from other sources. Indeed, on or about December 28, 2017, Witt obtained Alprazolam from her dog's veterinarian. On or about December 27, 2017, Witt returned to Mosaic. Although she was misusing the Holy Trinity and engaging in drug seeking behavior, Mosaic again refilled her Holy Trinity drugs including an increased frequency of her hydrocodone. Further, at all times relevant preceding the fatal crash, Mosaic continued to prescribe the Holy Trinity without warning Witt of the risks of driving while on this combination of drugs, or otherwise effectively taking timely steps to prevent Witt from misusing the Holy

Trinity, including but not limited to, entering into a drug treatment agreement, having Witt read and sign the "Material Risk Notice" required by the Oregon Medical Board when prescribing opioids for chronic pain or using urine drug screening or drug screens to determine what drugs Witt's was using. As result, Mosaic continued to provide drugs that perpetuated Witt's substance use disorder and overuse of drugs that caused impairment. Mosaic knew or should have known that while overusing the Holy Trinity and similar drugs, Witt would likely drive impaired, which created a substantial risk of harm to herself and other drivers or bicyclists using the road at the same time.

17.

At all times mentioned herein, Witt owned and operated a black 2002 GMC Sierra pick-up, with the license plate number 716KCR ("Vehicle"). The model of the Vehicle is an extended four-door cab truck powered by an 8-cylinder diesel engine with a minimum curb weight of two tons. At all times mentioned herein, the Vehicle was in good operating condition.

18.

On December 27, 2017, Witt filled a prescription from Mosaic for the Holy Trinity. Witt knew or reasonably should have known that operating a vehicle while under the influence of such drugs created an unreasonable risk of harm to others. However, Witt did not receive adequate treatment or warnings consistent with standards of care from her health care providers, as discussed above, to appropriately address her overuse and misuse of drugs, or to warn her that taking these drugs concomitantly could cause her to become substantially impaired while driving a motor vehicle.

19.

At all times mentioned herein, Witt lived on Dodds Road, in Bend, Deschutes

County, Oregon. Dodds Road is generally an east/west, relatively level two-lane rural roadway of asphalt construction with a yellow centerline and white fog lines bordering the traffic lanes. At all times material, the asphalt surface of Dodds Road was in good condition.

**20.**

On or about December 30, 2017, Witt left her home sometime between 11:00 a.m. and 12:00 p.m. to shop in Bend. Witt ingested various prescription medications that day including, but not limited to, the Holy Trinity of drugs.

**21.**

At approximately 3:21 p.m. on December 30, 2017, Witt was driving the Vehicle eastbound on Dodds Road. At the same time, Dr. Stone and two friends were lawfully riding their bicycles in the westbound lane, hugging the fog line, along the same stretch of Dodds Road.  Dr. Stone was the last in line of the three riders.

**22.**

 While under the influence of prescription drugs, Witt drove the Vehicle eastbound across the center line of Dodds Road into the westbound lane at speeds in excess of 50 mph. Witt crossed the full width of the westbound lane and struck and killed Dr. Stone as the Vehicle veered onto the gravel shoulder of the westbound lane. Evidence of contact damage, human tissue and fragments of a bike helmet were found on the Vehicle's front bumper and blood was found on the undercarriage and passenger's-side winch hook placement. Dr. Stone's helmet was "obliterated" and her body came to rest in the bar ditch on the side of the road.

**23.**

When approached by investigators at the scene of the accident, Witt was glassy-eyed, lethargic and unable to track conversation with investigators. After exiting her

vehicle, Witt walked in a manner that "resembled a person walking on the deck of a moving boat or ship. She unnecessarily held her arms out to her sides as if she was anticipating a fall." Witt did not know what day it was and was unable to successfully perform field sobriety tests. Witt denied the use of narcotic drugs and refused to give a blood or urine sample to investigators. Witt refused to allow investigators to search her vehicle and refused to be examined by a Drug Recognition Expert.

24.

A search of Witt's Vehicle after her arrest revealed two prescription medication bottles. One bottle contained Clonazepam (41 pills), Oxycodone (2 pills), and Tramadol Hydrochloride (8 pills), while the other contained Carisoprodol (11 pills). Based upon information and belief, Witt did not have a prescription for Oxycodone or Tramadol. Based upon a subsequent laboratory tests performed by investigators, Witt tested positive for the Holy Trinity as well as Alprazolam. The amount of prescription drugs in her system indicated that she was significantly impaired while driving.

## CLAIM FOR RELIEF

**(Medical Malpractice/Wrongful Death)**

25.

Plaintiff Stone re-alleges paragraphs 1 through 24 as though set forth fully herein.

26.

Mosaic's Providers had a duty to Dr. Stone to take steps to minimize the risk that Witt would misuse prescription drugs in a manner that would endanger others, specifically driving impaired while abusing her prescription and related drugs. Further, Mosaic's Providers' had a duty to minimize Witt's risk of engaging in drug seeking behavior, to warn her of the risks associated with misusing prescription drugs

that cause impairment, to warn her of the risk of driving while taking a combination of drugs that could cause her to become impaired or to overdose, to warn her of the risks of combining her prescriptions drugs with other drugs, to warn her of the risk that combining prescription drugs with other drugs could cause an overdose, and to warn her that driving while impaired or overdosing created a substantial risk of harm to other drivers or bicyclists using the road at the same time.

**27.**

Mosaic's Providers were negligent in one or more of the following particulars, each of which created a foreseeable and unreasonable risk of injury to Dr. Stone:

a. Prescribing the Holy Trinity without any legitimate medical purpose and without sufficient evidence of any benefit;

b. Prescribing a benzodiazepine in combination with opioids contrary to United States Food and Drug Administration's standards (Black Box Warning);

c. Prescribing Carisoprodol in combination with opioids and benzodiazepines (the "Holy Trinity") in a manner that was inconsistent with medical prescribing standards;

d. Failing to timely establish and implement an effective drug management plan with Witt with respect to the use of Holy Trinity in light of her substance use disorder and drug seeking behavior;

e. Failing to enter into a drug treatment agreement with Witt to monitor and manage expectations of her use of drugs (considered the Standard of Care by the Oregon Medical Board);

f. Failing to have Witt sign a "Material Risk Notice" which outlines risk, addresses addiction, and warns about caution with driving and operating machinery;

g. Failing to use testing to determine whether Witt was misusing, including, urine drug screening or other drug screens;

h. Failing to offer or otherwise require Witt to participate in an evidence-based treatment program to manage her substance use disorder;

i. Increasing the frequency of Witt's dosage of Hydrocodone when it was not medically necessary nor reasonable;

j. Failing to warn Witt of the risk of combining prescribed controlled substance drugs with illicitly obtained controlled substance drugs from other sources without a proper prescription;

k. Failing to advise Witt of the risk of driving while using a combination of the Holy Trinity and/or controlled drugs illicitly obtained without a proper prescription, including, but not limited to, the risk that she could become substantially impaired by drive, lose control of her vehicle, and cause injury to another driver or bicyclist using the road that the same time; and

l. Failing to promptly taper or otherwise limit Witt's use of the Holy Trinity which is known to be a highly dangerous drug combination associated with substance abuse.

**28.**

Each of Mosaic's Providers' negligence, as described above, was a deviation from their respective duties to use that degree of care, skill and diligence which is used by ordinary careful practitioners in each health care provider's respective field in the same or similar circumstances in their respective community of practitioners or a similar community.

**29.**

As a result of Mosaic Providers' negligence, Witt's substance abuse disorder was

further enabled with the continuation of the Holy Trinity. In addition, the inadvertent lapse in Witt's prescriptions of drugs likely lead her to seek additional controlled substance medications from her dog's veterinarian. Mosaic treating health care providers had a duty to Dr. Stone to take steps to minimize the risks associated with Witt's substance use disorder, to warn her of the risks of abusing drugs that cause impairment and the risk of using impairing drugs concomitantly while driving, which could cause her to lose control of her vehicle (and thus cause injury to drivers or bicyclists using the road at the same time, like Dr. Stone). Mosaic Providers knew or should have known that Witt's addictive consumption of overprescribed impairing drugs could likely lead her to drive a vehicle while impaired. While misusing the highly dangerous Holy Trinity, Witt drove a vehicle while impaired and killed Dr. Stone.

**30.**

Mosaic Providers' negligence was a substantial factor in causing Dr. Stone's death. Mosaic's health care providers' negligence caused Dr. Stone's Estate, Children and other Family members to suffer pecuniary loss in the form of reasonable charges for burial and memorial services rendered for memorial and funeral expenses, future support and income, including, but not limited to, income that she would have generated over the course of her professional career as a dentist, as well as services to the Estate in an amount to be determined by a jury at trial but not expected to exceed $23,000,000. This amount is subject to amendment prior to trial to conform with the evidence established by vocational and financial experts.

**31.**

As a further result of Mosaic treating heath care providers' negligence as set forth above, Dr. Stone's Estate, Children and Family have been deprived of Dr. Stone's companionship, love, society and comfort, for which her Estate is entitled to an award

of noneconomic damages in a reasonable amount to be determined by a jury at trial, but not expected to exceed $9,500,000. Said amount is subject to amendment prior to trial to conform with the evidence.

WHEREFORE, Plaintiff Stone requests judgment against Defendant United States as follows:

a. Economic damages in an amount not to exceed $23,000,000;

b. Noneconomic damages in an amount not to exceed $9,500,000;

d. Plaintiff Stone's costs and disbursements incurred herein; and

e. Such other relief that the Court deems just and equitable.

DATED: December 29, 2020

THE STEELE LAW FIRM, P.C.

By: _____
Nathan G. Steele, OSB #004386
Attorney for Plaintiff Jerry C. Stone,
as Personal Representative for
the Estate of Dr. Marika Stone